Mr. Tini, we'll hear from you when you're ready. Thank you your honor. May it please the court. My name is Derek Tini and I'm here on behalf of the defendants, appellants in this case, the key commissioners of Fayette County, West Virginia. The first error of the district court that I'd like to focus on in my oral argument is its evisceration of the savings clause of the Safe Drinking Water Act. I'm sorry, I don't mean to stop you on a roll, but before you get into that, I want to clarify one fact. This comes right at the start of the district court opinion. I just want to make sure I'm getting this right. Certainly. EQT has a state permit that allows it to operate the UIC well? That is correct. And they have state permits for their 200 conventional drilling operations also? That is correct. Okay, so your position then is that even where the state of West Virginia has specifically authorized and licensed a particular activity, a municipality can ban it? That is correct. How do you reconcile that with West Virginia law, like the Brackman's case, which seemed to say exactly the opposite, that if you have a state license, localities can't effectively nullify it. That, to me, seems like it's the heart of this case, so if you can answer that question for me, that would be helpful. Certainly. There are, with regard to the UIC permit, the underground injection control, what differentiates this case from Brackman and the other cases in the West Virginia reporters is that there are specific savings clauses in the West Virginia statute and in the federal statute that preserve the ability of local governments, such as municipalities and counties, to regulate, to abate nuisances, to prevent public health hazards. So you think that what Brackman stands for is localities cannot effectively nullify a state license unless there's a savings clause that allows them to do sort of the traditional work of abating nuisances? Certainly, because what Brackman looks at is whether or not there's a conflict between the state and the local law. What I would say here is that a conflict is impossible where the state legislature and where Congress have specifically preserved the abilities of local governments to regulate or to act in this area to abate nuisances. If every county can pass one of these NIMBY statutes, the state has made a judgment, right, that you're allowed to do this subject to regulation. If every county can say, not in my county, you're not allowed to, how is that not going to frustrate or be an obstacle to the state plan to allow this activity subject to regulation? You're not going to be able to allow it anywhere in the state if every county can one by one say, but you can't do it here. Certainly, but the state of West Virginia and the state legislature and Congress have already made that determination that they're going to allow the local governments to abate the nuisances as they see them. If the West Virginia legislature wanted to deprive the counties and municipalities of the ability to regulate or to act in this manner to abate nuisances, then they would need to be more express and they would need to take the savings clauses out. Well, then every permit is a nuisance because they got a permit and not only is the permit issued by the state, but it's issued by a state in compliance with federal regulations. There's a shared federalism on this statute and so that it complies with the EPA standards and the West Virginia standards, which were approved by the EPA and the permit was issued and they're conducting their business pursuant to a permit. Now, a local county comes and says, well, that activity is a nuisance. Therefore, we're revoking the permit. That sounds pretty strange, doesn't it? I don't think it is that strange. First, Congress foresaw this possibility and specifically stated in the Safe Drinking Water Act that nothing in the Safe Drinking Water Act, nothing should affect any authority of any locality to act to regulate underground injection. Of course, you have a big spill and oil starts dripping around and creates a nuisance and so forth. There can be activity on that, but here we're talking about an activity of a process where there is not a spill, there is not a nuisance, there is an activity for mining that has been assessed and a permit issued saying you can do it. Yes. And it seems to me once you issue an affirmative permit, they should be able to continue to do it unless the localities are going to usurp that authority. I mean, the permit has its own conditions and what it says in the savings clause. The permit doesn't permit them to spill or to spew gas into the air or spray oil over cars. Certainly. What it does permit them to do is engage in the activities that they're engaging in. What the Fayette County Commission found was that even if they were in compliance with the terms of their permit, there was evidence that contaminants from these wells was winding up in the streams of Fayette County. Fayette County has the authority under West Virginia law to abate public nuisances through the adoption of an ordinance. They looked at the evidence, they concluded there was a public nuisance, and they took action under state law to abate it by prohibiting the activity that they believed that the state of West Virginia was not acting with sufficient alacrity on. And the West Virginia Supreme Court of Appeals has recognized that even an otherwise lawful activity can result in a public nuisance. Public nuisances commonly arise in heavily regulated areas. And once Fayette County reached that determination under state law, they had the authority to do that. That authority was specifically preserved by the savings clauses in both the West Virginia Water Pollution Control Act and in the Safe Drinking Water Act. That's the Sharon Steele case here. It seems to me to be applicable to the position you take. I believe that it is. So Sharon Steele was a case in front of the West Virginia Supreme Court of Appeals. It involved the city of Fairmont acting under a statute that gave cities similar authority to abate nuisances as a statute at issue in this case. In that case, an industry, Sharon Steele, the plaintiff in that case, an entity had decided that it wanted to become a permanent storage location for hazardous waste. And the city of Fairmont determined that the permanent storage of hazardous waste would be a public nuisance. And so it enacted an ordinance which would prohibit that activity. And the applicant or the entity that wanted to open the hazardous waste location sued, took it to the West Virginia Supreme Court of Appeals. And the West Virginia Supreme Court of Appeals determined, number one, this is not preempted by state law. Even though there was a federal hazardous waste act, the Resource Conservation and Recovery Act, there was a state hazardous waste act. But the West Virginia Supreme Court of Appeals concluded, look, those statutes, both the federal and the state statute, have savings clauses that allow local governments to continue to protect their constituents by the adoption of ordinances that prohibit nuisances. The city of Fairmont determined that this was a public nuisance. This was an action that was authorized by the state statute that empowered municipalities. Basically then, if the permit says they can pump water, let's argue contaminated water, down the well, below the aquifer, in the manner which they do for this type of, what do they call it, UIC type of mining, if the permit allows them to do that and the county or the then you trump the permit. Is that it? That is the case, because the permits all have conditions that say you must comply with local law. But Sheriff Steele sort of expressly contemplated this problem and said that municipalities do have the power to abate what the law holds to be a nuisance, but they do not have the power to enact that any particular thing counts as a nuisance. And if it is actually expressly permitted by state law, you can't turn around and say that now counts as a nuisance. Respectfully, I don't think that's what the court in Sharon Steele said. They did say that they upheld the city of Fairmont's effort to regulate hazardous waste. And what they said was that whether something is a public nuisance is a fact question. And if the city of Fairmont wanted to enforce its ordinance against Sharon Steele, it would still have the burden at trial to establish the facts of a public nuisance. But that the state statute enabled municipalities to enact ordinances such as the one that the county had enacted. Yeah, I think that it's more like what Judge Niemeyer asked you about. And I guess what your answer was, well, they're dumping stuff into the stream. It may be that the county retains the power to say, hey, you've got to get that stuff out of the stream. But I'm not sure that Sharon Steele says, and you also retain the power to say, you can't use your permit anymore. Well, but it was looking at the savings clauses in both the federal RCRA and in the State statutes prohibited the county, or in that case the city, from taking an action under the legislatively delegated authority to enact ordinances to evade nuisances. We're using the risk of a nuisance to undermine and prohibit the very conduct that is permitted. This is not the state. If we're talking about, let's just take that pumping the water down in the mine. That is permitted conduct. Both the feds and the state allow that. It's specifically allowed in all the regulations. Now, for the county or the locality to come in and say that's a nuisance addresses the very conduct that's permitted. That's quite different from saying there's an overflow spilling into the streams or there is a spill or there's a spray into the air that's not permitted. So the question is, you really have to see the scope of the permitted conduct to see whether you contravene it. And you're sort of arguing a hypothetical which is not relevant here because you're trying to stop the very permitted conduct. You're not trying to stop a nuisance. You're trying to say that the permitted conduct is a nuisance. And I don't know why that doesn't directly conflict. Well, the difficulty with that position, with EQT's position, is that both Congress and the West Virginia legislature have expressly preserved the authority of local governments to determine whether or not, what level of risk they are willing to... Concede all that. Concede all that. But the question is, the idea to protect yourself against nuisances doesn't give you the authority to declare permitted conduct to be a nuisance. But it does. It does under West Virginia law. The West Virginia Supreme Court acknowledges that otherwise lawful businesses... That's all there is to know about the disagreement here is that from your position, permitting conduct does not in and of itself define what a nuisance is. That's right. The Stinkin's Clause says that the cities and the towns, the people who are there, have to drink the water. They get to define a nuisance. And you can permit a conduct and the state says, fine, go ahead and do it. But they say, you can come back and define what the nuisance is. Now the burden is on you to say it in fact is a nuisance. Otherwise, they get to do it because they've got a commitment to do it. That's the disagreement. If you take the other position on it that, well, you're permitted, and now you can't ever challenge it unless you show it is actually in your streams or is actually doing something, that's just a disagreement as to what it means. As I understand your position is, no, the city gets to determine whether or not this is a nuisance. And that's what the purpose of the savings policy is. I think that hits at the heart of the matter, Your Honor. The question is, does the Fayette County have the authority to enact an ordinance to abate a nuisance? And West Virginia Code allows it. Fayette County has determined that they don't want to tolerate the risk to their environment, to their residents' drinking water, to their very vital tourism economy from polluted water. The savings clauses preserve that authority within Fayette County. If the West Virginia legislature wants to expressly preempt Fayette County's authority to do that, then they should do so. But on the state of the law right now, Fayette County has the authority to do this. It is preserved by the savings clauses and there is a specific federal, I'm sorry, a specific state statute that gives them the authority to abate nuisances by enacting ordinances. Another state court opinion that I think is relevant here and has been discussed in the briefing, I'm sorry, another state West Virginia Supreme Court case is the Parker v. City of Fairmont case. And what happened in that case is the City of Fairmont wanted to go after an industry that was emitting smoke and soot into the air. And they attempted to bring an enforcement action, if you will, the City of Fairmont against the polluter. And the state Supreme Court said, no, no, no, you can't do that. Before you can target an otherwise lawful business, you first must enact an ordinance that describes to everyone and puts on notice that smoke and soot is going to be considered a nuisance in the City of Fairmont. You have the authority to do that under state law. That was your mistake, City of Fairmont. You should have first enacted an ordinance to define what the nuisance was, and then you could have sought enforcement. So what Fayette County has done is expressly what the West Virginia Supreme Court of Appeals told the City of Fairmont to do in the Parker decision. And so that's what we are dealing with here, is an exercise of the county's authority to decide what level of risk it will tolerate for a nuisance. It was confronted with evidence that underground injection control wells where they were They decided to exercise their authority under state law to enact an ordinance that prohibited that activity. It is not preempted on the basis of field preemption because of the savings clauses specifically with regard to underground injection. Congress specifically said that nothing in the Safe Drinking Water Act shall diminish any authority of a state or political subdivision to adopt or enforce any law respecting underground injection. Congress recognized that in setting up a floor for the regulation of the underground injection that it didn't want to tread too far onto the power of state and local authorities to best analyze what level of risk they will tolerate in their communities to their resources. So they preserved the authority of the local governments to enact ordinances to abate nuisances. And the same type of provision is found in the West Virginia Water Pollution Control Act. It says nothing in this chapter in the West Virginia Water Pollution Control Act is the authority under which the UIC permit was issued. I see that my time has expired. What about the Oil and Gas Act? That doesn't have a savings clause. You're right. I see that I'm out of time. I'd be happy to address your question, Your Honor. You can answer his question. Thank you. The West Virginia Oil and Gas Act, you're correct, does not have a savings clause. The West Virginia Oil and Gas Act, now let me take a step back. The EQT production has challenged two aspects, two main aspects of the ordinance. One is the prohibition on the permanent storage of natural gas waste at a production site. The other is the underground injection. The answer to the question of the effect of the Oil and Gas Act depends on which provision you're talking about. With regard to the storage provision, the Oil and Gas Act does not have a savings clause, but there's no conflict there with the permanent storage provisions because the Oil and Gas Acts do not allow the permanent storage of natural gas waste at a production well. As far as the underground injection, the Oil and Gas— I'm sorry, but under the ordinance, you also can't temporarily store the material if it's going to be disposed of ultimately in county. So you also—EQT still can't even temporarily store things. That's correct, but EQT has brought a facial challenge to the ordinance, and their burden there is to show that it's unlawful in any application. That on their specific facts that they may run into problems with a temporary storage provision doesn't allow them to strike down the ordinance in its entirety. The other answer to that question is that it wasn't the intent of Fayette County to ban EQT's temporary storage. But nevertheless, that's exactly what they wrote. I don't understand how it makes this case go away that now you're saying, we made a mistake, and as to this guy, we won't enforce it. I mean, it is what it is. It says this thing is a ban on UIC disposal, and it does it two ways. It says you can't dispose by UIC, and you can't even temporarily store material if you will dispose of it by way of UIC in this county. It's just—and I just—I don't understand how that goes away by saying, well, we won't enforce it against this one entity. I think it's more than saying that we won't enforce it against that one entity. I don't want to—they are separate provisions, the storage provision and the injection provision. Striking is all one provision, really. It is, but there is a severability clause. So this court—the court could strike down the storage provision but still uphold the underground injection prohibition. You know, they are severable. They are too distinct. I don't think that the analysis should be confused and conflated. Just before we leave the Oil and Gas Act, I mean, the Oil and Gas Act also covers water pollution, right? And there are a bunch of cross-references between the Oil and Gas Act and then the Water Act. Is it—it's not obvious to me that the Oil and Gas Act doesn't also preempt the flat-out UIC ban. And that was the second part of my answer to Judge Wynn. The Oil and Gas Act, to the extent that it empowers the director of the Office of Oil and Gas to issue a UIC permit, his authority is expressly derived from the West Virginia Water Pollution Control Act. And that's where the savings clause is. So it imports not only the—so when the director of the Office of Oil and Gas is given the authority to issue a UIC permit, he does so under the West Virginia Water Pollution Control Act, which not only allows the underground injection, but it also preserves, through the savings clause, the authority of localities. So your argument is that the savings clause is basic—is incorporated into both statutes? For purposes of underground injection, yes. All right, thank you. Thank you, Your Honor. Mr. Miller. May it please the Court, Tim Miller on behalf of Appalachia EQT Production Company. In terms of the decision in this case, I came up here prepared to argue that you needed to look at only one case, the Brackman case, to essentially decide this case on a preemption issue. I would point out, in terms of trying to use the savings clause as some kind of catch-all that allows a municipality to, in effect, regulate the state government and regulate the federal government, it is a misguided reading of generic savings clauses. Let me point out that in the ordinance and the amended ordinance, they stayed consistent in a couple ways. First was the declaration and the findings of the whereas clause, that the finding that the commission had plenary authority to determine what is a public nuisance, even if it conflicts with federal or state law. That is completely contrary to the West Virginia Constitution, Article 9, Section 11, which declares that commissions, municipalities, et cetera, are inferior beings, and they only have the powers directly and specifically delegated to them by the state of West Virginia. Bissett v. Town of Littleton clearly said, Local powers by its nature neither inherent nor absolute. Using the savings clause, as Mr. Keeney would argue, would give every county, 55 counties, 300 municipalities, every board of health in the state of West Virginia, absolute power to, in effect, veto what state or federal government has determined is lawful activity and is not a nuisance. Let me point out that in Brackman, in a way to, I think, understand this question of whether a savings clause can somehow help the commission escape the situation they're in. Give me at least a chronology of what we're talking about here. We've got Brackman, 1943. Did a savings clause come about? There was a savings clause as it relates to municipalities and what their powers were. The municipalities in West Virginia literally- What are we talking about here? Beg your pardon? The ones we're talking about here. There was a generic savings clause to municipalities that allowed them to abate nuisances. In each city charter, literally, when a city wants to become a city, they have to apply for it to our state to obtain a charter approved by the state of what powers they may or may not exercise. I think it was the Act of 1937 they were looking at in Brackman. There was a clause that talked about the ability of municipalities to abate certain nuisances. But contrast, if you will, the Brackman case in which we're talking about beer sales in which the municipality in that case stepped in and said, we want to ban any, they call it non-intoxicating beer, within 300 feet of a church. In that case, the statute as it existed at that time gave the power to the state tax commissioner only to issue licenses for the location of any establishment that dispensed beer and including the determination whether the location was proper and whether or not it was allowable activity for that community. In that case, our Supreme Court ultimately held that the exclusive authority resided in the state tax commissioner to determine whether in fact that establishment could have that license there. Importantly, for terms of interpreting whether this city charter that had the abatement savings clause in it could prevail over the state action, I point out to some language, and I can't say it any better than I'm going to just quote from the decision. Attached to every statute and ordinance is the implied condition that the state, that the same must yield to the predominant power of the state where that power has been exercised. To hold otherwise. Speak, if you will, to Sharon Steele. It seems like to me, it seems to me to be more important. It's an 1985 case and it's dealing specifically with a ban on permanent storage and disposal as it's waste. I think it can be... We're not talking about beer. I think it can be distinguished for three reasons. A, it was not dealing with beer. It was dealing with hazardous waste specifically identified and defined under the RCRA. And specifically, under RCRA, there was a savings clause related to hazardous waste. Notably in that opinion, you'll note Sharon Steele did not possess, it had applied for, but did not possess a permit from any federal or state agency to construct this hazardous waste facility at the time. While they had applied for it, they held no permit. That was a critical fact in that case. Secondly, oil and gas waters, the produced waters we're talking about in this case, has been specifically exempted from RCRA as a hazardous waste. And finally, it is not a hazardous waste. And so under RCRA's savings clause, the fact that you had a savings clause which the court believed applied in this circumstance, there was no conflicting federal or state permit in this case. And in this case, the substance we're talking about has been determined not to be a hazardous waste. For that reason, I think you can clearly distinguish Sharon Steele as an outlier. Let me go back, if I can, to the question of the exclusive preemption, the savings clause that might apply, good examples under West Virginia law. Brackman is one. And then you also have Alderson v. City of Huntington, 1949. And that was a case involving real estate licensing. And there was a savings clause in that state. In that case, Judge Winn, that I think is a clear example of where you could have a municipality being able to regulate something the state is also regulating. In that case, the statute in question had empowered the state to license and impose fees on real estate brokers to obtain a license. The City of Huntington enacted the same ordinance, in effect wanted to extract another fee from the local real estate brokers. The local real estate brokers objected to the fact they were going to have to pay another tax or fee to the City of Huntington. But in that case, the Act of Legislature of 1937 expressly declared that cities may license and tax certain privileges, including the privilege of conducting real estate practice. So you had a savings clause there that was very specific to the activity being conducted. In this case, the savings clauses in West Virginia Code 713-KK is not a blanket authorization that applies to activities regulated under oil and gas. It's a generic. Municipalities reserve their rights to abate public nuisance. Just like in all our statutes, the common law right to bring a private cause of action  So the fact that there can be some state regulation in certain cases deals with the specific delegation of that power to the municipality, as we had in Alderson v. City of Huntington. Not so in the Brackman case, where they held you didn't get a specific delegation for the beer sales in relation to location of churches. And in fact, the statute was so comprehensive in its regulations, you have no power whatsoever, even if it made sense to have that ordinance. So let me go back to an argument made in the reply brief. I want to talk about fuel preemption as it relates to the Oil and Gas Act, if I can. I would disagree that there's been an incorporation by reference of the savings clause of the Water Pollution Control Act into the Oil and Gas Act. There is no such express declaration in the Oil and Gas Act itself. Let me at least understand correctly. West Virginia is yet to recognize fuel preemption? Well, I disagree in one respect. I think it's a matter of semantics. We don't have a case directly on point where the court declares, we are now going to consider whether we shall or shall not adopt fuel preemption. I argue they have applied fuel preemption. And the best example of that is the Brackman case. Again, we had a situation in Brackman where there's language in there talking about, in this case, the State Tax Commissioner had the exclusive and sole authority to regulate this area, and therefore, nothing that the City of Huntington tried to do in that case could stand. It just struck me. I'm not sure it matters whether there's fuel preemption or not. That struck me as more of an obstacle or conflict, the obstacle version of conflict preemption. It obviously frustrates the state regulatory scheme if every county can opt out of it one at a time. And I think that's what Judge Copenhaver relied on, the obstacle preemption. As I read his memorandum of being a senior. It's a form of conflict preemption. It's not the same as fuel preemption. I guess my question to you is, is it necessary for us to make a determination as to whether or not West Virginia acknowledges fuel preemption, so long as it acknowledges a rule that says if you have a license from a state for a particular activity, local government cannot prohibit or impede that activity? As you've described it, I would agree. You don't even have to go to fuel preemption. The question, I think, as opposed to fuel preemption, we may be splitting hairs in that regard. I think the reason that argument is being made by the appellant, they're trying to divide the activities they're trying to regulate. The UIC program under the Safe Drinking Water Act is clearly, the Congress has declared that it believes that the most safe and efficient way to dispose of produced water from oil and gas activities, basically brine and salts, is through an underground injection control well. Rather than through your public operated treatment program, your disposal through discharging the streams. Other methods of permits under Water Pollution Control Act you can treat and dispose into a stream. Congress has set up the fact that we believe the better way is a UIC program which we can delegate to the state, which they have done. In contrast, I think what the appellants are trying to preserve is when they amended the ordinance in March of 2016, they inserted the words temporary. That all we're trying to do is prohibit the... provided you have a permit for that activity. I still think there's a question of fuel preemption as it relates to that, because they're still intruding upon an area that under the Oil and Gas Act is the exclusive province of the DEP. When they issued us a permit to operate an oil and gas well, 200 oil and gas wells, it included their regulation of the treatment, process, handling, and storage of the oil and gas waste. And while the fact it may be put in a tank, which is ultimately going to go to permanent disposal, we're handling it, processing. It's always going to end up permanent disposal somewhere. So I don't know how you can divorce the temporary from the permanent in this case. It's like there's a possibility fuel preemption could under the Oil and Gas Act apply because there is no savings clause. Is sharing steel still good law? It has not been reversed. I got your distinction in terms of what you... how you say it's distinguished, but I'm just finding it hard not to consider that case has some implications here, given the nature of what is still dealing with that. Of course, is it your key distinction that there was not a permit that had been issued? I think that is a distinction. The court didn't go on to declare that as the key distinction, but they certainly took the time to note in their opinion that there was no federal or state permit that allowed the construction of this hazardous waste facility. So I have to believe it was a fact that the court was considering. The other part of it is, though, I think also, in that case there wasn't a question that the materials they were talking about had been declared a hazardous waste. Does the issuance of a permit consider whether that that is being permitted is a nuisance or could be a nuisance?  means it is not a nuisance. The question is in the handling of it, can it be a nuisance? As you mentioned, I think in a particular circumstance, a spill or Judge Niemeyer, an activity that in and of itself is not a nuisance if it's handled improperly can result in a nuisance. So let me try to understand this in terms of common understanding. You're saying that a state can permit an activity and then the people who are local who drink the water, who deal with this instance, they cannot challenge this and say it is a nuisance. In other words, go into court and say, no, this in fact is a nuisance because the state statute has effectively said by definition it's not a nuisance unless it actually does something that makes it a nuisance. The fact that you, in this case, injected a substance into a storage formation, I don't believe a citizen or local person could say we can declare that's a nuisance. You've got it as a permitted activity. They may have an opportunity to go into court and say that this is a nuisance here. Absolutely, under the circumstance of a spill. For example, the well, the integrity of the well contaminated the groundwater. Well, let me make sure I understand that. By distinction, of course, it's a spill. That's a whole different ballgame. I'm saying here you've got this. You have to wait for it to spill or to contaminate your water before you can go in and say, this is a nuisance. I don't believe they can do that in the circumstance we have here where we have a state and federal government who's determined it's not a nuisance. They have to wait until that water goes bad, and hopefully it doesn't, before they can challenge it. No matter what might exist out there to show otherwise. In fact, if I understand your point, your point is that the state statute or at least the permit, by definition, they have made that determination that this basically will not happen. You're not going to have a spill. A spill is an accidental type thing. It's not going to seep. It's not going to do other things into the water supply. That's correct. They've made that determination in the manner in which we permitted it. If you see the permit, the appendix, it's a very detailed document. If you handle it in this way, it's not a nuisance. What is the purpose of the savings clause? The savings clause, I think, is just generally to permit municipalities, commissions to enact ordinances or file civil actions, if you like, for activities that are not otherwise regulated and permitted by the state or federal government. So it has no application if there's a permit issue? Correct. If you're going to be in conflict with what the state has permitted, the activity, in effect, it goes to the question of can the municipality declare what is a nuisance? If the state has already declared, if you handle it pursuant to this UIC program and pursuant to the permit we've issued to you, it is not a nuisance, then I don't believe they can, the city, municipality, cannot declare that a nuisance. Let me ask one other question because this is very important. It's important to the state of West Virginia. Of course, we and the federal courts are making these determinations as to what the state law is. I have some confusion as to how much how applicable Sharon Steele is. You said Brackman is really the case in 1943. And I'm not disagreeing with all of that, but is there room here for us to get what I think what may be a definitive answer? That is to certify this question to the West Virginia Court of Appeals and ask them does it have this effect, that this particular in other words the permitting aspect of it per se from your perspective sounds like to me it says this cannot be a nuisance, you can't challenge it because we've done it. Or to ask them the effect of what Sharon Steele Well, the court obviously retains under its rules the power to do that. I don't think it would be necessary in this instance. As Judge Copin ever found, he felt there was plenty of case law regarding whether or not municipalities have plenary power or not that he could decide this case. And the only thing he did in terms of an eerie analysis was on the issue of field preemption. To the extent you're not even having to go to field preemption there really was particularly no need to certify the question. We clearly have conflict preemption. There's a little twist in this case too. It's sort of the participatory federalism where the standards have been set by the federal government and adopted by the state and approved by the federal government as part of the state scheme. The exchange for giving the state the authority to regulate all this is the fact that it complies with the federal standards set by the EPA in this case. So that it may not be a pure state law issue. That is a good point. This program, the UIC program as opposed to the well site program is clearly... Explain that to me. Does that mean we are now talking about federal preemption or state preemption? Under the Safe Drinking Water Act, the federal statute I want to be clear on that. I'm asking the state high school in West Virginia at least in terms of certification to do with state preemption. And I want to understand your reply there in terms of the interaction of the fact that the state is doing something via the federal. Does that make the state law then part of saying well now this is federal preemption because the state is only doing what the federal... I think it does make it part of the federal. In effect it's the pyramid. What is it called? Is it called some hybrid preemption? I don't think I've ever heard of it before. We address this in the Coal Act cases. All the Coal Act regulations by West Virginia are approved by the federal government. And we have cases addressing we call it, I can't remember, participatory or shared. It's a strange thing where Congress wanted to set the standard but have the states enforce it and carry out and regulate it. This is part of that same type of desire. I think it creates a very difficult analysis but it looks like the force of federal law is sort of streamed into the state law which because the feds authorized the states to adopt it so long it was compliant with the EPA regulations. Well and piggybacking on that Well did you make such an argument as that? We did argue preemption, your honor. I hadn't heard that argument. I've seen, that's a good argument. I like it. But you didn't make that argument. So I don't know where that came from. I thought the district court did hold that the UIC ban at least was preempted by federal law. Yes, it did apply both the Safe Drinking Water Act In the Safe Drinking Water Act it specifically says the states cannot enact a program that enacts injection control class 2 wells. So there's some intermingling of who's authority we're talking about here but I think Judge Kobinger probably concluded there's two ways. There's both state and federal preemption as it relates to the UIC well. Because under 42 USC section 300H What does it say? It says the states cannot Cannot prohibit Which act is this? It's 42 USC section 300H Under 300H subsection A 2 Regulations of the administrator under this section for state UIC programs may not prescribe requirements which interfere with or impede A, the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production or oil and natural gas storage or operations. So clearly Congress declared you can develop this program EPA and in turn delegate it to the state of West Virginia but the one thing you can't do is prohibit the underground injection of these brine substances. That's a clear and definite statement of what Congressional intent was and then the USC program was adopted by the state of West Virginia meaning they could certainly not do anything but they were prohibited to do it from their delegation from the EPA. So I think in that case we have a situation where it's not just a general question of SMAC or the participatory regulation. In this case we've got a specific provision which indicates what the state program can or cannot do. So I was confused. You were reading that I want to be clear because this is kind of every time we get in these areas it's like you're teaching up here. But I thought that applied to the EPA. It's something they can't do. The state is a whole different ball game. The state has a savings clause. In other words you can't do more or you can't do less than what is required here but you can do more. But it can't be more that's inconsistent with the direction of Congress. That's a regulation from the administration. Of course they've given the opportunity to make these regulations but they also approve the state system. The state system can only be in place with federal government's permission. That's correct. But I want to stick with this and that probably gets back to this joint federal state exemption which is good argument again but this is dealing with in terms of what the EPA can do and it doesn't allow the EPA to do these things. Where does it say here the state is under that same kind of limitation? Something that's happened in the state of West Virginia, it cannot do anything more with regard to something that happens in the state. Federalism has a reach. I'm not sure it reaches that far. Because the state in 1993 applied for a program in which it adopted and said we will do everything exactly the same as the EPA administrators do. So in effect incorporated by reference. To get approval of the program which it was approved in 1994. That's what I'm trying to get an understanding of. It seems to me all this thing says is EPA can't approve a plan that bans the wheel. EPA can't. But that doesn't mean the state can't do something. I guess I would argue otherwise that if Congress had declared this was a lawful activity and it couldn't be prohibited under the UIC program, I would argue that the subordinate to the federal government could not enact that prohibition. Thank you. Thank you your honor. I'd like to pick up on that last point. I'm confused. What is this 300H subsection 2? I understood the argument correctly. It says that right there. You just cannot do anything. It applies to the state, not just the EPA. Certainly. That provision does not apply to what a state can do. I think that that is a I vehemently disagree with counsel for EQT production on this case. On this point. The federal Safe Drinking Water Act is a cooperative federalist system. It sets a floor for what a state program has to be. It does not set a ceiling. Congress directed EPA. EPA, you write some regulations. In your regulations, these are the model for what the states can do. In your regulations, don't impede the disposal of natural gas waste. They also said, EPA, if you end up administering your own program, you have to allow the disposal of natural gas waste. EPA took that ball and ran with it. Promulgated regulations and specifically promulgated regulations that allowed states to omit or modify its own regulations. The EPA recognized the interplay of those provisions cited by EQT production with the Savings Clause. The Savings Clause says nothing in this chapter impedes the ability of a state to regulate the underground injection. All Congress was doing was saying, EPA, here's your floor. At the same time, it told EPA that it couldn't interfere with states. States wrote some regulations and those regulations are cited in our brief and they specifically allow the omission of Class II wells, which are the wells that are used for the injection of natural gas waste. It is perfectly compliant with the Safe Drinking Water Act for a state to promulgate a program in which it says underground injection is prohibited unless you have a permit. These are the types of permits you can get. You cannot get a permit for natural gas waste. EPA could approve such a program under the Safe Drinking Water Act. I have no question about that. That's consistent with the literature out there on the Safe Drinking Water Act. To suggest that states are limited in some way by directions that Congress gave to EPA, it dangerously alters the federal-state balance in the Safe Drinking Water Act. In thinking about this, you may already have answered this question, so apologies if I'm just not picking it up. There's no distinction in your mind between whether a state can more stringently regulate these wells under this provision or whether they can ban them entirely. I can imagine a reading of the regulation that would allow for more stringent state regulation. Do you think a state could just ban these wells? I believe that it could. The reason is the statute starts out with a general prohibition. The underground injection of waste is prohibited unless you have a permit. Then it sets out the classes of permits. The classes of permits are set out in the regulations at Section 144.6, I believe. Then EPA says, you can omit or modify any of these provisions. That would allow the state to omit Class II wells entirely. You start from the assumption that the behavior is illegal. It's prohibited to inject underground waste. The question of stringency is, what exceptions do we create to the general prohibition against the injection of waste? It is simply more stringent to have fewer exemptions to the general prohibition. I think that's it. It just seems inconsistent to me that any state would want federal government to have the power to come in and inject something in this ground and you can't say a word about it. If that's un-unscathed, that's what it sounds like. It's prohibited. You can't do it. That's the position that they take and the consequence of the position that they take. There are a lot of areas in which the federal government controls exclusively. We've had all these fights over air pollution and we've said in a published opinion that the states who try to regulate it, they can't. This is a federal domain to regulate that. Here under 42 USC 300H we're talking specifically about the regulations that states can adopt and cannot adopt. In 300H if it was Congress... I can't figure out how it could be any clearer that the federal government was asserting its authority over this over these wells. There's two answers and I'm running out of time so may I have the court's permission to give both real quickly? Well you still have time. The first answer is that the savings clause. Congress has the power to regulate. They have specific directions apart from the savings clause. They direct specifically about this injection method and they do not want the states to take that away. They give specific directions about the injection method to EPA and then in the next breath they say nothing in this subchapter shall diminish any authority of a state or political subdivision. So they preserve the ability. I understand that but they have the specifics they want to protect. Otherwise all the states and localities might deny the mining basis which is in the national interest to have this mining go on. So Congress said that we're going to allow this injection procedure to occur and you can have regulations and so forth but you can't deny that process. That's not exactly what Congress said. Congress in 300H gave directions to EPA about what its regulations could contain. But at the same time if you look at the structure of section 300H that's correct and then there's the savings clause. If Congress had really intended to do and you have to look at the context of the entire statute before you interpret it. If Congress had really intended to require that state programs allow class 2 injection then the proper place for it to put it was in 300HB1 because that provision is the part where it says such regulation shall require that a state program do A, B, and C. If Congress had intended to require states to allow the underground injection of natural gas waste this is where it should have put that direction. 300HB1 is where Congress speaks to state programs. And 300HB2 is where it speaks to EPA. I think that distinction is very important. Alright, thank you. Thank you, your honors. Alright, we'll come down and greet counsel and then take a short recess.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Pamela A. Harris